UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL DENTON, RANDI L. KREMIAN and DORIS MARIE GRANAT-MONTEIL ) ) ) Plaintiffs, ) ) v. ) ) ) NORTHEAST ILLINOIS REGIONAL ) COMMUTER RAILROAD CORPORATION ) d/b/a METRA ) ) Defendant. ) | Case No. 02 C 2220  Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the motion of Defendant Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra ("Metra") to strike expert reports and bar testimony of Dr. Robert Tiballi. [Dkt 82.] For the reasons set forth below, Metra's motion is granted.

## BACKGROUND

Plaintiffs Daniel Denton ("Denton") and Randi Kremian ("Kremian") (collectively, "Plaintiffs") brought this action under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq*. ("FELA"), alleging that in 2000 the floor of the building where they worked for Metra became contaminated with molds, fungi and bacteria, and they became ill as a result of being exposed to

1

unsafe work conditions. (Compl. ¶¶ 8, 10, 11.) [Dkt 1.][1] The present motion relates to one of Plaintiffs' proposed expert witnesses, Dr. Robert Tiballi.

**Factual Background**

Denton has been employed by Metra since November 1994, and has worked in Metra's Safety and Rules Department ("Safety Department") since 1999. (Daniel Denton Dep. at 7-8, 12-13, 15.) [Dkt 93.] Kremian began working in 1980 for the Illinois Central Gulf Railroad, and continued to work for Metra after Metra took over Illinois Central in 1986. (Randi Kremian Dep. at 23-24.) [Dkt 93.] She worked in Metra's Safety Department from 2000 to June 2001. (*Id*. at 22-24.) In May 2000, the Safety Department, including Denton and Kremian, moved from another building to the 15th floor of 547 West Jackson, Chicago. (Denton Dep. at 13.)

The events leading to the filing of this case were set out in a previous opinion granting summary judgment to Metra on the claim of a third plaintiff. *Denton v. N.E. Ill. Regl. Commuter R.R. Corp.*, No. 02 C 2220, 2005 WL 1459203 at *1-2 (N.D. Ill. June 16, 2005) (Brown, M.J.). In December 2000, there was a water leak in one of the women's bathrooms on the 15th floor where the Safety Department was located. (Pls.' Exs. Resp. Mot. Bar, Ex. 11, Deposition of Dennis Mogan at 22-23.) [Dkt 88.] The bathroom was out of service for five to six weeks. (*Id*.) In January 2001, Ronald Bachus, an industrial hygiene engineer at Metra, investigated complaints by several Metra employees of various symptoms. *See Denton*, 2005 WL 1459203 at *1. In interviews with several people in the Safety Department, he learned that some employees were experiencing a variety of

---

[1] The parties have consented to the jurisdiction of a Magistrate Judge and the case was reassigned to this court pursuant to 28 U.S.C. § 636(c). [Dkt 8, 9, 10.]

2

symptoms, including facial swelling, tingling of lips, headaches, allergic type symptoms and digestive symptoms. *See id.*

In February or March 2001, the Safety Department was temporarily moved from the 15th floor to the 5th floor. (Denton Dep. at 13; Mogan Dep. at 66-67.) After a six week period on the 5th floor, the Safety Department was moved back to the 15th floor for approximately two months. (Denton Dep. at 13.) In May 2001, the Safety Department was relocated to the 16th floor. (*Id*. at 14.) In the fall of 2001, the Safety Department relocated to the 14th floor. (*Id*.; Mogan Dep. at 68.)

Around January or February 2001, Denton first reported his symptoms, which included facial swelling, cold sores, tingling lips, sinus pain and drainage, "plugg[ed] up" ears, fatigue, and itching on his face and eyes. (Denton Dep. at 29, 33; Metra's Mot., Ex. A, Denton Railroad Employee Injury And/Or Illness Record at 2; Metra's Mot., Ex. C, Tiballi Report re: Denton.) Kremian claims that around February 2001, she developed a sinus infection, sinus pressure, infections in both of her eyes, headaches, tiredness, eye irritation, and broken blood vessels in her eyes. (Kremian Dep. at 64-65.)

**Dr. Tiballi's Reports**

Plaintiffs filed this action against Metra on March 27, 2002. (Compl.) After several extensions, Plaintiffs were ordered to serve Rule 26(a)(2) disclosures by June 4, 2004. (Order, April 28, 2004.) [Dkt 26.] On June 4, 2004, plaintiffs identified Dr. Kim Anderson, a building expert, and Dr. Robert N. Tiballi, D.O., as their Rule 26(a)(2) expert witnesses. (Metra's Mot. ¶ 19.) Dr. Tiballi prepared a report setting out his opinions about Denton's and Kremian's conditions. (Metra's Mot. ¶¶ 16, 18; Ex. C, Tiballi Report re: Denton; Ex. E, Tiballi Report re: Kremian.)

Dr. Tiballi's report about Denton is one page (Tiballi Report re: Denton), although his office notes of his March 31, 2004 examination of Denton are also in the record (Metra's Mot., Ex. D). At his examination, Denton provided Dr. Tiballi with his medical history, some documents describing air quality culture results, and some prior medical records. (Tiballi Report re: Denton.) In the report, Dr. Tiballi states that he reviewed Denton's medical records and deposition testimony, and "the above mentioned documents."[2] (*Id.*) Dr. Tiballi describes, presumably from Denton's medical records, the symptoms that Denton first reported around January 24, 2001, and other doctors' evaluations and treatments of those symptoms. Dr. Tiballi states that Denton's physical examination was "consistent with chronic allergy to airborne allergens." (*Id.*) Dr. Tiballi opines that:

> Mr. Denton's symptoms appear temporally related to the relocation of his workplace to the 15th floor of 547 West Jackson Boulevard . . . which occurred on or about May, 2000. His symptom complex is consistent with severe allergic reaction to airborne antigens. These reactions began to occur after being physically present in the above mentioned workspace, resolved when away from the workspace and recurred after reintroduction to the workspace. Causation of symptoms being induced by presence in workplace is high, greater than 51% likely.

(*Id.*)

Dr. Tiballi's report regarding Kremian is two pages. (Tiballi Report re: Kremian.) No notes of his examination of Kremian are in the record. In the report, Dr. Tiballi states that he reviewed Kremian's medical records and deposition testimony, and the "above mentioned documents."[3] (*Id.*

---

[2] At his deposition, Dr. Tiballi explained that the cover letter to Plaintiffs' counsel enclosing his report listed other documents that he had reviewed. (Metra's Mot., Ex. F, Tiballi 9/28/04 Dep. at 20-21; Ex. G, Tiballi 10/26/05 Dep. at 59-60.) That cover letter does not appear to be in the record. Dr. Tiballi testified that he reviewed statements of other Metra employees, and environmental studies and culture results obtained by Metra. (Tiballi 9/28/05 Dep. at 62.)

[3] Those are the documents listed in Dr. Tiballi's cover letter to Plaintiffs' counsel about which he testified at his deposition, as discussed in the preceding note. (Tiballi 10/26/05 Dep. at

at 1.) The first page of the report provides information regarding Kremian's history of doctors' evaluations and treatment. (*Id*.) Dr. Tiballi reports that he examined Kremian on May 26, 2004, but does not describe how he conducted the examination. (*Id*. at 2.) At that time, Dr. Tiballi obtained Kremian's medical history and recorded her statement that the symptoms of rhinitis improved dramatically after she was moved from the 15th floor. (*Id*.) Dr. Tiballi diagnosed Kremian with a history of severe allergic rhinitis and conjunctivitis secondary to environmental-type allergies, but no signs of continuing rhinitis, conjunctivitis or sinusitis. (*Id*.) Dr. Tiballi opines that:

> Her symptoms returned and worsened after her relocation of workplace to the 15th floor of 547 West Jackson Boulevard . . . which occurred on or about May, 2000. Her symptom continued unabated by her history [sic] until she was transferred out of the building environment in question, at which time they improved and are now resolved. Her symptoms complex is consistent with severe allergic reaction to airborne antigens and resultant complications. She later developed migraines and nausea which were temporally related to presence in the building environment, now resolved since removal from the building environment. These reactions began to occur after being physically present in the above mentioned workspace and resolved when away from the workspace. They worsened again after repeated exposure to the building space in question. Causation of symptoms being induced by presence in workplace is high, greater than 51% likely.

(*Id*.)

**Dr. Tiballi's Deposition**

Metra's counsel began Dr. Tiballi's deposition on September 28, 2004. (Tiballi 9/28/04 Dep.) After a couple of hours, the deposition was adjourned to be continued. (*Id*. at 94.) When the deposition resumed on October 26, 2005, Dr. Tiballi was unable to locate his records regarding Plaintiffs. (Tiballi 10/26/05 Dep. at 6.) At the first session of his deposition, Dr. Tiballi was asked

---

61.)

by Metra's counsel what "allergens/antigens" Denton was exposed to and at what level, to cause the severe allergic reaction discussed in Dr. Tiballi's report. (Tiballi 9/28/04 Dep. at 91.) While Dr. Tiballi believed that the air quality test results that Denton had given him supported his opinion, he was unable to identify the allergens/antigens without reviewing those results. (*Id*. at 91-93.) At the second session of his deposition, he again recalled reviewing air quality testing results that Denton provided, but did not have the documents available. (Tiballi 10/26/05 Dep. at 24-25.) He could not recall the specific identity of the isolates or the specific colony counts, but he recalled that there were "relatively high colony counts of mold and spores in the air samples." (*Id*. at 25.) When asked whether any of those substances were at levels that are known to be harmful to human health, Dr. Tiballi responded, "I believe that they would be considered to be a possible focus of airborne allergy provocation and could adversely lead to an alteration of . . . the normal baseline of human health." (*Id*. at 25-26.) When asked about the specific substances that caused Plaintiffs symptoms, Dr. Tiballi testified that the "only identifiable factor" was a higher colony count of molds and spores than he would expect. (*Id*. at 28-29.)

Dr. Tiballi was asked about his conclusion that the "causation of symptoms being induced by presence in workplace is high, 'greater than 51% likely.'" (*Id*. at 35.) He testified that if the history that Denton recounted to him was correct, and the documents (presumably, the air quality studies) were correct, "it was more likely than not" that Denton's previous symptoms were due to exposure in the workplace. (*Id*.) Similarly, Dr. Tiballi testified that, based on Kremian's history of her symptoms becoming much worse when she was in the workplace and dramatically improving after being relocated outside the workplace, the "likelihood was high" that her symptoms were the result of workplace exposure. (*Id*. at 94.)

6

Dr. Tiballi testified that he was basically following "Koch's posulates, . . . summed up by exposure, removal from exposure, re-exposure." (*Id*. at 20.) He further explained:

> If a person, on exposure, developed certain symptoms, that may lead to – due to the chronicity of exposure, may lead to an alteration of the baseline health and then, upon removal from the exposure, has resolution of those symptoms and then, upon re-exposure, develops those symptoms again and any quantifiable changes in the baseline of that person's normal baseline health.

(*Id*. at 21.) He acknowledged that in a situation where there was only an initial exposure and no second exposure, the effect would be "difficult to judge." (*Id*. at 22-23.)

Dr. Tiballi did not believe that the conditions in 2000-2001 caused the symptoms that Denton was experiencing in 2004 when Dr. Tiballi examined him. (*Id*. at 45.) Kremian was not experiencing any symptoms when Dr. Tiballi examined her in 2004. (*Id*. at 83.)

Metra now moves to strike Dr. Tiballi's reports and bar his testimony on the ground that his opinions fail to meet the standards for admissibility of expert testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Metra's Mot. at 6.)

## DISCUSSION

Federal Rule of Evidence 702, which governs the admission of expert witness testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

7

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 597 (1993), the Supreme Court emphasized the "gatekeeping" role of the federal trial judge in ensuring that any expert testimony is not only relevant but reliable. Consistent with the Court's opinion in *Daubert*, Rule 702 requires that the expert's testimony must be based on reliable principles and methods reliably applied to sufficient facts or data. As the proponents of the testimony, Plaintiffs have the burden of demonstrating that it is admissible. *See Allison v. McGhan Med.Corp*, 184 F.3d 1300, 1312 (3d Cir. 1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 735 (N.D. Ill. 2005).

Metra does not argue that Dr. Tiballi is not qualified to render an expert opinion. He testified at length about his training, qualifications and experience in treating infectious diseases. (Tiballi 9/28/05 Dep. at 22-39.) Instead, Metra argues that Dr. Tiballi's opinions are not based on sufficient facts or data, and are not based on a reliable method reliably applied.

It is the obligation of a federal court, before admitting expert testimony to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. "This requires the court to consider whether the testimony has been subjected to the scientific method, ruling out any subjective belief or unsupported speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citation omitted).

In exercising that obligation, the court concludes that Dr. Tiballi's proposed testimony does not meet the required standards. There are two fundamental problems: a lack of precision in the data and facts upon which the opinions are based, and a lack of reliability in the methodology and the application of the methodology to the facts.

Dr. Tiballi's opinion appears to be based on the temporal relationship between Plaintiffs' symptoms in 2000-2001 and what Dr. Tiballi recalled to be reports of high colonies of spores and molds on the 15th floor where the Safety Department was located, "a chronicity of exposure . . . lead[ing] to an alteration of the baseline health," as he phrased it. A critical part of that analysis is Plaintiffs' medical and personal history relative to their exposure to the allegedly injurious substances, starting with an accurate "baseline health." Dr. Tiballi learned some of Plaintiffs' history from medical records but much of it was self-reported. As Metra points out, there were potentially significant omissions from Plaintiffs' reports of their medical histories to Dr. Tiballi, such as Denton's childhood history of ear infections. (Tiballi 9/28/04 Dep. at 68.)[4] Also, Dr. Tiballi was not aware that Kremian had medical treatments for allergic rhinitis and other conditions in June, July and October 2001 after Kremian left the building in May 2001 to become a locomotive engineer. (Tiballi 10/26/05 Dep. at 84-88.) Although when questioned, Dr. Tiballi did not view these omissions as changing his initial opinions, the fact that the information was not included in the initial history upon which he based his opinions casts doubt on the completeness of the data underlying the opinions.

Likewise, although Dr. Tiballi based his opinions on the relationship of exposure and symptom, he had very little information about the duration and extent of Plaintiffs' exposure, especially compared to other possibilities for exposure to other potential allergens. Coming into this case three years after the events, Dr. Tiballi had to rely on Plaintiffs to describe the extent of their exposure. However, Dr. Tiballi did not know what jobs Plaintiffs performed for Metra, or how

---

[4] At his deposition, Denton admitted that he has had problems with both of his ears since he was eight years old, including ear infections, tubes in his ears, and his ears being "plugged up," which resulted in dizziness because of his loss of equilibrium. (Denton Dep. at 30-32.)

9

much time they spent in the office as compared to the field. (*Id*. at 43-44, 89.) Although he knew that Kremian has lived on a farm with horses since childhood, and noted in his report that she was diagnosed with inhalant sensitivities and food sensitivities (Tiballi Report re: Kremian at 2), he did not know the specific allergies or sensitivities, including whether she was allergic to horses. (Tiballi 10/26/05 Dep. at 90-91.) Nothing in Dr. Tiballi's report or testimony reflects that he considered and ruled out alternative explanations.

Additionally, there is no specific identification of the allegedly injurious substance that caused the symptoms, other than Dr. Tiballi's recollection that Dr. Anderson's report described unusually high spore and mold counts. Dr. Tiballi did not administer to Plaintiffs any tests to determine their allergic reaction to particular substances. (*Id*. at 52-53, 91.) Notably, the medical literature Plaintiffs submit to support Dr. Tiballi's opinions recommends skin and serum tests, with "reasonable specificity and sensitivity and . . . positive and negative controls," to evaluate patients for the presence of specific antibodies to molds. (Pls.' Exs. Resp. Mot. Bar, Ex. 13, *Guidance for Clinicians on the Recognition and Management of Health Effects Related to Mold Exposure and Moisture Indoors*, App. C-1.) Dr. Tiballi does not cite that document as a basis for his opinion, and there is no indication that he followed its procedures.

The absence of specific information about the identity of the allegedly injurious substance and level and extent of exposure undermines any conclusions that Dr. Tiballi reached. *See Wirtz v. Northrop Corp*., 110 F.3d 508, 513 (7th Cir. 1997) (expert testimony properly excluded where expert did not know specific information such as the level or frequency of exposure to suspect substance, the work environment, and the correlation of symptoms with level of exposure).

Dr. Tiballi's report does not describe a methodology, but in his deposition he referred to "Koch's postulates." Metra criticizes that methodology, which is based on the work of nineteenth century microbiologist Robert Koch, as "obsolete." (Metra's Mot. at 15.) However, even assuming, *arguendo*, that Koch's postulates retain some usefulness, in order to have any validity, the process would have to be applied with much more precision than has been done here. The methodology as explained by Dr. Tiballi, involves exposure leading to an alteration of the baseline health, then, upon removal from the exposure, resolution of those symptoms, and then, upon re-exposure, development of those symptoms again. Putting aside the problems with identifying Plaintiffs' "baseline health," obvious requirements are the identification of the suspect substance and a second exposure that is controlled to eliminate alternative explanations. As Dr. Tiballi acknowledged, without a studied second exposure, it is "difficult to judge." (Tiballi 10/26/05 Dep. at 22-23.) Without a controlled second exposure to a specifically identified suspect substance, the methodology becomes essentially *post hoc ergo propter hoc*. As the Seventh Circuit has said in a different context, "[*p*]*ost hoc ergo propter hoc* is not a good way to prove causation." *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005).

The unreliability of Dr. Tiballi's conclusion is illustrated by Kremian's case. In his report, Dr. Tiballi states that Kremian "developed migraines and nausea that were temporally related to presence in the building environment, now resolved since removal from the building environment." (Tiballi Report re: Kremian at 2.) However, Kremian's migraines and nausea did *not* resolve after she left the building in May 2001, but continued, along with allergic rhinitis, into October and November 2001. (Tiballi 10/26/05 Dep. at 63, 83-87.) The logic of Koch's postulates suggest the

11

*opposite* of Dr. Tiballi's conclusion with respect to Kremian. His conclusion with respect to Denton is likewise unreliable, based on inadequate information and a questionable methodology.

Plaintiffs observe that they were required to submit to an independent medical examination by Dr. Waksman, and speculate that Dr. Waksman followed a methodology similar to Dr. Tiballi's. (Pls.' Mem. Opp. at 2.) However, the burden is on Plaintiffs to demonstrate that the expert testimony that they advance to support their claims meets the standards of Rule 702. Dr. Tiballi's opinions in this case do not meet that standard.

## CONCLUSION

For the reasons discussed above, Metra's Motion to Strike Expert Reports and Bar Testimony of Dr. Robert Tiballi is granted.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

August 17, 2006